**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **KATRICE H.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **No. 20 C 3650** |
| v. ) | |
| ) | **Magistrate Judge Finnegan** |
| **KILOLO KIJAKAZI, Acting** ) | |
| **Commissioner of Social Security,**[1] ) | |
| ) | |
| **Defendant.** ) | |

## ORDER

Plaintiff Katrice H. seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a brief explaining why the Commissioner's decision should be reversed or the case remanded. The Commissioner responded with a competing brief in support of affirming the decision. After careful review of the record and the parties' respective arguments, the Court finds that the case must be remanded for further proceedings.

## BACKGROUND

Plaintiff applied for DIB and SSI on March 6, 2013, alleging in both applications that she became disabled on January 2, 2010 due to tinnitus in both ears, arthritis in both

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. She is automatically substituted as the named defendant pursuant to Fed. R. Civ. P. 25(d).

hands, and Turner syndrome. (R. 93, 101). Born in March 1973, Plaintiff was 36 years old as of the January 2010 onset date, making her a younger person (under age 50). (*Id.*); 20 C.F.R. § 404.1563(c); 20 C.F.R. § 416.963(c). She graduated from college with a Bachelor of Arts in 1995. (R. 477, 2181). From January 1997 to March 2011, Plaintiff worked as an administrative assistant and cashier at various companies. (R. 477, 483, 2181-82, 2191). Plaintiff says she stopped working on March 18, 2011 because her "hearing loss got bad and [she] could no longer do the job" (R. 465, 476, 2183-84), but she worked some short-term jobs through a temp agency between 2012 and 2015. (R. 2185-87). This included a job conducting surveys for Manpower from 2014 to 2015, which Plaintiff claims she lost because of her hearing issues. (R. 73-75, 2185-87). None of the jobs after March 18, 2011 constituted substantial gainful activity.

The Social Security Administration denied Plaintiff's DIB and SSI applications initially on May 24, 2013, and again upon reconsideration on November 6, 2013. (R. 93-130). In January 2015, administrative law judge ("ALJ") Jose Anglada found that Plaintiff was not disabled at any time from the January 2, 2010 alleged disability onset date through the date of the decision. (R. 131-51). Plaintiff filed a request for review, and the Appeals Council remanded her claim on July 13, 2016. (R. 152-58). After holding a new hearing in December 2016 (R. 37-92), ALJ Anglada denied Plaintiff's claim on January 10, 2017. (R. 160-74). Plaintiff again requested review, and the Appeals Council remanded her claim. (R. 175-78). On remand, the case was assigned to ALJ Luke Woltering, who held a new hearing on July 3, 2019. (R. 2168-95). The ALJ heard testimony from Plaintiff, who was represented by counsel, as well as from a medical expert, Gilberto Munoz, M.D., M.P.H., and a vocational expert ("VE"), Kari Seaver. (*Id.*).

2

Plaintiff amended her alleged disability onset date to March 18, 2011 and was still considered a younger person under the regulations at that time. (R. 15, 2179); 20 C.F.R. § 404.1563(c); 20 C.F.R. § 416.963(c).

On July 30, 2019, the ALJ found that Plaintiff has severe impairments in the form of coronary artery disease, sensorineural hearing loss, psoriasis with psoriatic arthritis, Turner syndrome, and cervical radiculopathy, as well as non-severe impairments in the form of diabetes, osteoporosis, hypertension, a heart attack, and adjustment disorder with depressed mood. (R. 18). The ALJ concluded that none of those impairments meets any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, either singly or in combination. (R. 19).

After reviewing the evidence, the ALJ concluded that Plaintiff has the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b) and § 416.967(b), except she cannot: climb ladders, ropes, or scaffolds; work around hazards such as unprotected heights and exposed moving mechanical parts; or drive a motor vehicle. Plaintiff can occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl and she can frequently handle, finger, push, pull, and reach with her bilateral upper extremities. The ALJ also determined that Plaintiff must work in an environment that is (1) without vibration and temperature extremes, and (2) no louder than a moderate noise environment. Finally, Plaintiff needs job instructions in writing, through demonstration, or in close face-to-face proximity due to difficulty hearing conversational voice and cannot understand speech unless it is above moderate noise level. (R. 20-21).

The ALJ accepted the VE's testimony that a person with Plaintiff's background and this RFC could not perform Plaintiff's past relevant work as an administrative assistant

3

and cashier but that she could perform other jobs existing in significant numbers in the national economy such as a hand packer, assembler, and sorter, which all involve light, unskilled work. (R. 26-27, 2191-93). As a result, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act at any time from the alleged disability onset date through the date of the July 2019 decision and is not entitled to benefits. (R. 28). The Appeals Council denied Plaintiff's request for review (R. 1-6), and that decision stands as the final decision of the Commissioner and is reviewable by this Court under 42 U.S.C. §§ 405(g) and 1383(c)(3). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005); *Whitney v. Astrue*, 889 F. Supp. 2d 1086, 1088 (N.D. Ill. 2012).

In support of her request for reversal or remand, Plaintiff puts forth two primary arguments. First, Plaintiff contends that the ALJ's RFC assessment lacks a sufficient evidentiary basis because he failed to consider evidence related to her psoriatic arthritis and cervical radiculopathy, as well as evidence related to her cardiac conditions. Second, Plaintiff argues that the ALJ improperly evaluated her subjective statements regarding her symptoms. For the reasons discussed below, the Court finds that the ALJ's decision must be remanded for further consideration of Plaintiff's manipulative limitations.

## DISCUSSION

**A.     Standard of Review**

Judicial review of the Commissioner's final decision is authorized by section 405(g) of the Social Security Act (the "SSA"). *See* 42 U.S.C. § 405(g). In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart,* 362 F.3d 995, 1001 (7th Cir. 2004) (internal citation omitted). Nor may it "displace the ALJ's judgment by

reconsidering facts or evidence or making credibility determinations." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The court "will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011)).

In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). The ALJ need not, however, "'provide a complete written evaluation of every piece of testimony and evidence.'" *Pepper*, 712 F.3d at 362 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal citations and quotation marks omitted)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

**B.    Five-Step Inquiry**

To recover DIB under the SSA, a claimant must establish that she is disabled within the meaning of the Act.[2] *Snedden v. Colvin*, No. 14 C 9038, 2016 WL 792301, at *6 (N.D. Ill. Feb. 29, 2016). A person is disabled if she is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can

---

[2] Because the regulations governing DIB and SSI are substantially identical, for ease of reference, the DIB regulations are cited herein.

5

be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Crawford v. Astrue*, 633 F.Supp.2d 618, 630 (N.D. Ill. 2009). In determining whether a claimant suffers from a disability, an ALJ must conduct a standard five-step inquiry, which involves analyzing "whether: (1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy." *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021) (citing 20 C.F.R. § 404.1520). If the claimant meets her burden of proof at steps one through four, the burden shifts to the Commissioner at step five. *Id*.

**C. Analysis**

   **1. RFC Assessment**

Plaintiff contends that the ALJ erred in determining that she can perform "frequent" manipulation and light exertion because the ALJ's RFC assessment failed to consider evidence related to her psoriatic arthritis, cervical radiculopathy, and cardiac conditions. (Doc. 27, at 6-12).[3] A claimant's RFC is the maximum work that she can perform despite any limitations. *See* 20 C.F.R. § 404.1545(a)(1); Social Security Ruling 96-8p, 1996 WL 374184, at *2. An ALJ must base a claimant's RFC on all relevant evidence in the record, including the claimant's medical history and findings, the effects of treatment, reports of

---

[3] Plaintiff does not take issue with the ALJ's treatment of her other impairments, including her sensorineural hearing loss and Turner syndrome. The Court's analysis, therefore, addresses only those impairments at issue in Plaintiff's brief.

6

daily activities, medical opinions, and effects of symptoms. 20 C.F.R. § 404.1545(a)(3); Social Security Ruling 96-8p, 1996 WL 374184, at *5.

In determining the RFC, the ALJ relied most heavily on (and gave "great weight" to) the opinion of Dr. Gilberto Munoz, the medical expert who testified at the July 3, 2019 hearing. (R. 25-26). Dr. Munoz testified that Plaintiff has several medically determinable impairments consisting of psoriatic arthritis, Turner syndrome, moderate-to-severe bilateral hearing loss, and cardiac-related conditions, including coronary artery disease, left ventricle dysfunction and aortic insufficiency, an ejection fraction between 45-50 percent, Class I congestive heart failure, and a recent myocardial infarction, more commonly known as a heart attack. (R. 2172-73). Dr. Munoz testified that he was unable to establish an RFC for the period following Plaintiff's May 2019 heart attack because less than two months had transpired since the event. (R. 2174). As to the period preceding the heart attack, Dr. Munoz opined that Plaintiff was limited to light work with frequent postural activities and no climbing of ladders or scaffolds, as well as environmental limitations consisting of: moderate noise level; no work at unprotected heights or around moving mechanical parts; no commercial driving; and only occasional exposure to extreme cold and heat. (R. 2174-75). Dr. Munoz testified that Plaintiff had no manipulative limitations. (R. 2174). According to Dr. Munoz, Plaintiff's medical condition reached this level of severity in June of 2016—the first abnormal test date he located in the record. (R. 2176).[4]

---

[4] Dr. Munoz stated that this abnormal record could be found at Exhibit 23F, page 17. However, the record is an audiological evaluation from November 2016. (R. 1024). It is unclear if Dr. Munoz intended to cite a June 2018 echocardiogram at Exhibit 33F, page 17. (R. 25, 1859).

7

When questioned by Plaintiff's counsel, Dr. Munoz initially testified that he did not see any evidence of functional limitations stemming from Plaintiff's cervical radiculopathy and pointed to the normal findings from a consultative exam in May of 2013. (R. 2176).[5] After Plaintiff's counsel directed Dr. Munoz to an abnormal electromyography ("EMG") from May 2015, which documented a left cervical radiculopathy at C5-C6, Dr. Munoz testified that he had looked at the abnormal EMG and newly agreed that he would expect there to be functional limitations associated with it. Dr. Munoz went on to explain that "usually, upper extremities would be limited to frequent for [sic] fine movement." (R. 2176-77). Additionally, when asked whether he found any documentation of pain or swelling in Plaintiff's hands in the record, Dr. Munoz responded:

> No, that's what I was looking for and, I, I, I couldn't find it. She did have numbness and tingling, but I, I, I saw [INAUDIBLE] but I didn't see that she couldn't use her hands. That, that would be an issue.

(R. 2177).

Plaintiff contends that Dr. Munoz, and in turn, the ALJ, ignored evidence supporting her hand, arm, and wrist limitations stemming from her psoriatic arthritis and cervical radiculopathy. (Doc. 27, at 7-8, 10; Doc. 33, at 1-3). As to the ALJ's analysis, Plaintiff claims that he noted only a few positive findings related to her hands and arms (e.g., the May 2013 consultative examination finding no difficulty performing fine or gross manipulations, a May 2013 physical exam finding no joint swelling or tenderness, and a May 2015 physical exam noting full range of motion) and ignored multiple findings of wrist

---

[5] In the July 2019 hearing transcript, Dr. Munoz refers to a consultative exam from May 16, 2015, rather than May 16, 2013. (R. 2176). This appears to have been either a scrivener's error or misstatement by Dr. Munoz. (R. 585-89).

8

synovitis,[6] hand and joint swelling, and decreased sensation, as well as her complaints of ongoing pain. (Doc. 27, at 7-8). The Court agrees that further analysis of this issue is required.

To begin, Dr. Munoz's testimony at the July 2019 hearing indicates that he overlooked—and thus did not consider in his RFC assessment—evidence of swelling and pain in Plaintiff's hands. The Commissioner contends that "Dr. Munoz considered [P]laintiff's reports of hand pain, including numbness and tingling" but found that "the overall record did not indicate [she] was unable to use her hands." (Doc. 32, at 7). It is true that Dr. Munoz testified that Plaintiff had numbness and tingling. (R. 2177). But as noted, when asked whether he had found any documentation of any kind of pain or swelling in Plaintiff's hands, Dr. Munoz responded, "No, that's what I was looking for and . . . I couldn't find it." (*Id.*). However, at least a dozen physical exams documented some degree of wrist or finger swelling, including numerous instances in which wrist synovitis or synovial thickening were noted by Plaintiff's rheumatologist.[7]

Plaintiff's treatment records first mention synovitis during a rheumatology appointment on April 26, 2012. (R. 737). At that time, Plaintiff reported that, despite feeling better since she had started to take Humira, she continued to have "annoying pain in her fingers," which felt like "pins and needles" and was present "all the time." (*Id.*). A musculoskeletal exam revealed possible synovitis in Plaintiff's third proximal IP joint

---

[6] Synovitis is the medical term for inflammation in the synovium—the membrane that lines joints. It is characterized by swelling.

[7] Following Dr. Munoz's testimony, Plaintiff's counsel stated that "[t]he records do reflect extremity swelling" and noted that this included a history of swelling in the hands. (R. 2180).

9

("PIP") on her left hand. (R. 738). In December of 2013, another physical exam during an endocrinology appointment revealed some bilateral swelling of the PIPs. (R. 630-31).

Beginning in April of 2015, exams consistently showed synovitis in Plaintiff's wrists. On April 27, 2015, a physical exam revealed wrist synovitis, as well as large silvery white and erythematous plaques on the elbows and multiple pits on every finger. (R. 914). Plaintiff described the plaques as "extremely pruritic and painful," and noted that she scratched them overnight, causing them to bleed. (R. 912). She had been using ice packs to alleviate her hand pain. (*Id.*). Notably, a month later, Plaintiff had the abnormal EMG, revealing a chronic left C5-C6 radiculopathy. (R. 899-902). A focused neurologic exam showed normal muscle strength and bulk throughout both upper extremities; reduced sensation to pinprick in the palmar aspect of the first and second fingers on the right and first finger on the left; reduced sensation to pinprick in the left lateral upper arm; and positive Tinel sign in both wrists. (R. 899-900). At a rheumatology/arthritis progress appointment on November 2, 2015, another physical exam revealed right wrist synovitis, as well as pits on Plaintiff's fingers. (R. 961-63). Plaintiff had recently restarted Humira and reported that her shooting fingers-to-arm pain had resolved to a level 2/10, but she continued to complain of a "pins/needles sharp pain" from her fingers to her shoulders, which was worse on the left side. (R. 961). She noted that the latter had improved though, with episodes lasting for 15 minutes once per week. (*Id.*). Plaintiff also complained of some pain in her PIPs, which had gone from a level 10/10 to 5/10 since resuming Humira. (*Id.*). Plaintiff's rheumatologist noted that she might need to start Arava in the future, if her synovitis got worse. (R. 965).

On July 18, 2016, another physical exam revealed right wrist synovitis. (R. 958). Although Plaintiff's psoriasis had largely resolved with Humira and her shooting arm pain had reduced to a level 4/10, she complained of some pain in both wrists. (R. 954). Plaintiff had also recently started taking Arava for her psoriatic arthritis. (R. 960). On October 18, 2016, a physical exam once again revealed right wrist synovitis. (R. 1031-32). Plaintiff complained of increased flares in her hands and swelling in the fourth and fifth fingers of her left hand, as well as swelling in her PIPs, which lasted for an hour once per week. (R. 1030). In addition to continuing Humira and Arava, Plaintiff's rheumatologist recommended that she use topical or oral non-steroidal anti-inflammatory drugs ("NSAIDs") for her pain. (R. 1033).

Plaintiff's left wrist showed mild synovitis during an exam on November 7, 2016. (R. 1026). Records from this visit indicate that Plaintiff's use of Humira had been worsening her congestive heart failure and she was advised to stop taking it due to a newly diagnosed low ejection fraction. (R. 1025, 1028). After missing only one dose, Plaintiff reported that her condition was worse, including hand pain and a shooting pain from her fingers up to her arms. (R. 1025). Plaintiff's rheumatologist increased her Arava dosage and advised her to use NSAIDs for the pain. (R. 1028). A few months later, on April 18, 2017, a physical exam showed mild synovial thickening that was worse in Plaintiff's right wrist. (R. 1295). Plaintiff had started taking Stelara the prior month, which she felt was helping her arthritis only "somewhat." (R. 1294). On August 8, 2017, a physical exam showed synovial thickening in both of Plaintiff's wrists. (R. 1291). The shooting pains in Plaintiff's fingers were now intermittent, but she still had pain in her PIPs

lasting an hour at a time. (R. 1289). Gabapentin was helping with pain management, but Plaintiff continued to complain of weakness in her hands. (*Id.*).

On November 14, 2017, another physical exam revealed mild synovial thickening in the wrists. (R. 1284-86). Plaintiff reported minimal hand pain but complained that she was experiencing shooting pain from her hand up to her arms at night. (R. 1284). The rheumatologist decreased her Arava dosage but increased her Gabapentin dosage. (R. 1287). A physical exam on September 11, 2018 revealed trace synovitis in Plaintiff's left wrist. (R. 1474). She reported left wrist and elbow pain in the morning but no swelling in her fingers. (R. 1472). Gabapentin was helping with her hand numbness and shooting pains. (*Id.*). Physical exams on February 13, 2019 and June 5, 2019 again revealed trace synovitis in the left wrist, and Plaintiff continued to report left wrist and elbow pain. (R. 1938-41, 1946-48). The June 2019 exam also showed mild swelling in the metacarpophalangeal joints and PIPs. (R. 1940).

A month later, at the July 3, 2019 hearing before the ALJ, Plaintiff testified that she was having trouble with swelling in her hands and wrists. (R. 2188-89). She noted that the swelling was worse in her left wrist. (*Id.*). Additionally, Plaintiff testified that it is hard for her to pick up cups, write, and type and that she gets pain in her hands three to four times per week. (R. 2189). She uses warm towels and takes Tylenol to help with the pain. (*Id.*).

As these records show, doctors documented synovitis or swelling in Plaintiff's wrists or fingers at least a dozen times, with the vast majority from April 2015 through June 2019. Dr. Munoz's statement that he could not find any documentation of swelling in Plaintiff's hands strongly suggests that he did not consider this evidence in determining

whether Plaintiff has any manipulative limitations. It is also unclear whether Dr. Munoz considered any of Plaintiff's reports of hand and wrist pain throughout the record. This discrepancy requires further explication.

Contrary to the Commissioner's assertion, Dr. Munoz's opinion is not fairly "buttressed" by the other opinions of record. (Doc. 32, at 2). The ALJ gave only "some weight" to the May 24, 2013 and November 6, 2013 opinions from the state agency reviewers Drs. Hinchen and Bilinsky because "evidence received subsequent to [their] determinations indicate [Plaintiff] has additional restrictions." (R. 25). The ALJ's decision does not specify what new evidence he deemed relevant, but at the time the physicians issued their opinions they had access to only one treatment record (from April 2012) documenting possible synovitis in one of Plaintiff's PIPs on her left hand. (R. 737-38). Twelve exams documenting swelling and synovitis came later. The only other opinion was from Brian Layden, M.D., and Plaintiff does not disagree that the ALJ properly afforded his assessment little weight. (R. 25). *See Underwood v. Saul*, 805 F. App'x 403, 406 (7th Cir. 2020) (arguments not raised before the district court are waived).

Like Dr. Munoz, the ALJ provided no discussion of the documented synovitis and swelling in Plaintiff's wrists and fingers. In fact, there is no mention of "synovitis" in the ALJ's opinion at all. To be sure, the ALJ was not required to discuss every exam finding. (Doc. 32, at 1, 9-11); *see Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ need not mention every piece of evidence, so long as he builds a logical bridge from the evidence to his conclusion.") (citing *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008)). But "[a]n ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence

13

that points to a disability finding." *Id.* (citing *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009)). In this case, Plaintiff's counsel stated during the July 2019 hearing that the records reflected extremity swelling, including swelling in the hands, following Dr. Munoz's testimony to the contrary. (R. 2180). But the ALJ's opinion does not acknowledge any such evidence and instead points to only musculoskeletal exams with normal findings.

The ALJ's summary of the medical history does include two express references to Plaintiff's early reports of hand and wrist pain. (Doc. 32, at 8); (R. 22 ("On April 26, 2012, the claimant sought treatment for pain in her hands and knees"; and "On May 2, 2013, the claimant visited her rheumatologist with complaints of joint pain, mainly in her wrists.")); (R. 601-02, 739). The ALJ also noted that Plaintiff complained of "chronic joint pain and swelling, with radiating into her arms" when summarizing her testimony from the July 2019 hearing. (R. 21). However, there is a lack of specific discussion regarding the upper-extremity swelling and associated pain that was noted throughout the record—not just in Plaintiff's testimony. This, combined with its absence in Dr. Munoz's testimony (and indeed, his affirmative testimony that he found none) leaves the Court uncertain as to whether such evidence was properly considered in the ALJ's RFC assessment and, if not, whether its inclusion would have had an effect on the ALJ's functional determinations.

In concluding that this issue requires remand, the Court is not, as the Commissioner suggests, reweighing the evidence. (Doc. 32, at 3, 8, 11). The Court has not determined that Plaintiff has any additional functional limitations stemming from her psoriatic arthritis or cervical radiculopathy—and any associated swelling, inflammation, or other symptoms—that require further manipulative limitations. The Court also recognizes that the longitudinal record reflects several periods of improvement in

Plaintiff's symptoms, particularly when she was on certain medication regimens. The Court holds only that, given the lack of discussion regarding the documented swelling in Plaintiff's wrists and fingers in both the opinion evidence and the ALJ's RFC assessment, it is unclear whether additional manipulative restrictions may be warranted.

### 2. Remaining Arguments

The Court does not find any specific error with respect to Plaintiff's remaining arguments, but the ALJ should take the opportunity on remand to review all aspects of Plaintiff's RFC and reconsider her subjective statements regarding pain and other symptoms.

### CONCLUSION

For reasons stated above, Plaintiff's request to reverse or remand the case is granted. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

ENTER:

Dated: March 31, 2023

SHEILA FINNEGAN
United States Magistrate Judge